## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**FRANCIS BUTLER,**

Plaintiff,

v.

Case No. 1:15-cv-01410 (CRC)

**WASHINGTON METROPOLITAN
AREA TRANSIT AUTHORITY,**

Defendant.

## MEMORANDUM OPINION

Plaintiff Francis Butler, a longtime bus operator, alleges that his employer, Washington

Metropolitan Area Transit Authority ("WMATA"), unlawfully kept him on unpaid leave because

of his disabilities—sleep apnea and diabetes—in violation of the Rehabilitation Act.  He also

claims that, as a reasonable accommodation, WMATA should have reassigned him to a different,

vacant position within the organization.  WMATA responds that Butler was no longer medically

qualified to operate buses, both because his blood-glucose levels were unacceptably high and

because he failed to produce required sleep-apnea test results.  WMATA also contends that it

tried to reassign Butler through an internal job reassignment program, but that the process failed

because Butler only applied for positions that were outside of his union's local bargaining unit.

The Court finds that WMATA has established, beyond reasonable dispute, that Butler's

high blood-glucose measurements and his failure to produce sleep-apnea test results rendered

him medically unfit for the bus operator position.  This defeats Butler's claim that WMATA

engaged in unlawful disability discrimination by preventing him from operating buses.

However, the Court also concludes that a genuine factual dispute remains regarding whether

WMATA's efforts to reassign Butler satisfied its duty to reasonably accommodate his

disabilities.  Accordingly, the Court will grant in part and deny in part WMATA's Motion for

Summary Judgment, and deny Butler's Cross-Motion for Summary Judgment entirely.

I.      **Background**

A.  Statutory and Regulatory Background

The Rehabilitation Act of 1973 provides that "no otherwise qualified individual with a

disability . . . shall, solely by reason of her or his disability . . . be subjected to discrimination" by

any program receiving federal funding.  29 U.S.C. § 794(a).  When a lawsuit is filed under

Section 794 of the Rehabilitation Act, the statute instructs courts to apply the legal standards

used in resolving claims brought under the Americans with Disabilities Act of 1990 ("ADA"), 42

U.S.C. § 12101.  See 29 U.S.C. § 794(d); see also Drasek v. Burwell, 121 F. Supp. 3d 143, 153

(D.D.C. 2015) (applying ADA standards to Rehabilitation Act claim).  Under the Rehabilitation

Act, a plaintiff must be a "qualified individual with a disability."  29 U.S.C. § 794(a).  To be

"qualified," he must "with or without reasonable accommodation" be able to "perform the

essential functions of the employment position that [he] holds or desires."  42 U.S.C. § 12111(8).

To have a "disability," he must possess a "physical or mental impairment that substantially limits

one or more major life activities."  42 U.S.C. § 12102(1)(A).

The Department of Transportation ("DOT"), through the Federal Motor Carrier Safety

Administration ("FMCSA"), has promulgated regulations governing the medical qualifications

required for commercial vehicle drivers, including WMATA bus operators.  See 49 C.F.R. Parts

300–99 (2016).  Under that scheme, WMATA drivers must obtain a DOT medical certification,

known colloquially as a DOT Medical Card, 49 C.F.R. § 391.11; 49 C.F.R. § 391.41 & 43, and

must undergo periodic physical exams in accordance with the FMCSA regulations in order to

keep their certification valid.  Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s MSJ"), S.M.F. ¶ 16.

Since 2012, regulations have required that these exams be performed "by a medical examiner listed on the National Registry of Certified Medical Examiners." 49 C.F.R. § 391.43(a).

The FMCSA regulations also establish standards applicable to the medical conditions underlying this dispute—sleep apnea and diabetes. As relevant to sleep apnea, commercial drivers must have "no established medical history or clinical diagnosis of a respiratory dysfunction likely to interfere with his/her ability to control and drive a commercial motor vehicle safely." 49 C.F.R. § 391.41(b)(5). The FMCSA "Medical Advisory Criteria" further explain that "[e]ven the slightest impairment in respiratory function under emergency conditions . . . may be detrimental to safe driving," and the guidance lists "sleep apnea" as being among those "conditions that interfere with oxygen exchange and may result in incapacitation." 49 C.F.R. Pt. 391, App. A. Dr. Gina Pervall—who developed WMATA's sleep-apnea program and since 2011 has worked with the DOT Medical Review Board in developing FMCSA regulations—explains that WMATA considers compliant use of a "continuous positive airway pressure" ("CPAP") machine to be a reasonable accommodation for bus drivers with sleep apnea. Def.'s MSJ, Ex. 16 ¶ 34. Regular use of a CPAP machine is a form of treatment: It "indicates that the employee's sleep apnea is controlled." Id. Accordingly, under WMATA's recertification guidelines, "at the time of medical recertification, employees with established sleep apnea must provide a six[-]month CPAP compliance report," showing that the employee has used the machine for at least four hours per night, for 70% of nights. Id. ¶¶ 18–19; see also Def.'s MSJ, Exs. 9 & 13. Without such a report, the employee may be given a temporary, three-

month certification.  Def.'s MSJ, Ex. 16 ¶ 18.  But if no report is submitted for that three-month

period, the employee may be medically disqualified.  Id.[1]

As for diabetes, the regulations state that a driver is physically qualified if he has "no

established medical history or clinical diagnosis of diabetes mellitus currently requiring insulin

for control."  49 C.F.R. § 391.41(b)(3).  The Advisory Criteria go on to explain that a diabetic

"individual may [nevertheless] be qualified" under the rules "[i]f the condition can be controlled

by the use of oral medication and diet."  49 C.F.R. Pt. 391, App. A.  However, based on guidance

from the American Medical Association and other healthcare accreditation organizations,

WMATA considers blood-glucose levels at or above 9.5 percent—as measured by the A1c

test[2]—to be indicative of diabetes being "poorly controlled." Def.'s MSJ, Ex. 3, at 1; see also

Def.'s MSJ, Ex. 16 ¶¶ 12–14.  As a result, when a driver's A1c level is at or above 9.5, WMATA

instructs its medical staff not to certify the driver.  See Def.'s MSJ, Ex. 2.

B. Factual Background

1. *Butler's Failure to Obtain DOT Medical Card Recertification*

Francis Butler was a WMATA bus operator from November 1999 until his retirement on

June 1, 2015.  Def.'s Statement of Material Fact ("S.M.F.") ¶ 1.  Beginning in 2001 and until his

retirement, he was also a member of Local Union 922 of the International Brotherhood of

---

[1]  A more detailed version of WMATA's sleep-apnea guidelines is set forth in a
"Standard Operating Procedure" document, attached as an exhibit to WMATA's motion.  See
Def.'s MSJ, Ex. 4.  However, because the document was developed in December 2014, several
months after Butler was medically disqualified, the Court has not relied on the document in
reaching its decision.  For that reason, the Court will also deny as moot Butler's motion to strike
the exhibit.

[2] A1c levels are a percentage measure of an individual's average blood glucose.  It is the
primary test to evaluate diabetes management.  The A1c Test & Diabetes, National Institute of
Diabetes and Digestive and Kidney Diseases, (June 22, 2017), https://www.niddk.nih.gov/health-
information/diabetes/overview/tests-diagnosis/a1c-test.

Teamsters. Def.'s MSJ, Ex. 34. Due to a work-related wrist injury, Pl.'s Mem. Supp. Cross-Mot. Summ. J ("Pl.'s Cross-MSJ"), Ex. S, at 9, Butler worked only one year between 2009 and 2014, and was otherwise on unpaid medical leave, at times receiving workers' compensation. Id. at 96. Butler's wrist injury, however, was not his only medical ailment: He had been diagnosed with Type II diabetes by 2010 and severe obstructive sleep apnea by February 2013. Compl. ¶ 21. Butler treated his diabetes with oral medication rather than insulin. Pl.'s Cross-MSJ, Ex. S, at 87–8.

As noted above, Federal Motor Carrier Safety Administration regulations require WMATA bus operators to undergo periodic physical examinations in order to maintain a valid DOT Medical Card. Def.'s S.M.F. ¶ 14. In December 2012, a WMATA physician's assistant, Diane Ofili, qualified Butler for a three-month DOT Medical Card, Def.'s MSJ, Ex. 5, at 1–2, and later extended the card through June 17, 2013. Def.'s MSJ, Ex. 6.[3] Between June 2013 and April 2014, Butler remained on unpaid medical leave, without a DOT Medical Card. Compl. ¶ 32; see also Def.'s MSJ, Ex. 16 ¶ 21. On February 26, 2014, Butler's personal physician, Dr. Ophnell Cumberbatch, purported to qualify Butler for a DOT Medical Card, good for two years. See Pl.'s Cross-MSJ, Exs. A & C. However, Cumberbatch is not a registered Medical Examiner with the FMCSA, as required by regulation. See Def.'s MSJ, Ex. 21, at 1–3.[4]

Butler recollects that in the spring of 2014, WMATA informed him that he could return to duty pending a negative drug screening. Pl.'s Cross-MSJ, Ex. S, at 95. On April 22, 2014,

---

[3] The record is not entirely clear as to why Butler was granted these three-month extensions, but the doctor who oversees WMATA's sleep-apnea program notes that drivers with sleep apnea receive an initial three-month extension when they do not submit a CPAP compliance report. See Def's MSJ, Ex. 16 ¶ 18.

[4] The FMSCA regulations set forth a process for resolving "conflicts of medical evaluation," where physicians disagree as to whether medical certification is appropriate. See 49 C.F.R. § 391.47. Butler does not appear to have made use of those procedures.

Butler visited the WMATA Medical Office for a physical exam, necessary both for drug screening and for DOT Medical Card recertification. Def.'s MSJ, Ex. 16 ¶ 24. The examination included a blood test, which revealed Butler's A1c level to be 10.9. Pl.'s Cross-MSJ, Ex. S, at 98–9. Because WMATA does not certify drivers with an A1c level greater than or equal to 9.5, see Def.'s MSJ, Exs. 1 & 2, Butler's DOT Medical Card certification was placed on hold. Def.'s MSJ, Ex. 11.[5] WMATA at least twice instructed Butler—at the April exam and again on May 2—that he would need to provide acceptably low A1c test results in order to obtain his DOT Medical Card. See Def.'s MSJ, Exs. 8 & 10.

At the exam, Butler also failed to provide a six-month CPAP compliance report, which was required by WMATA's DOT Medical Card recertification policy. Def.'s MSJ, Ex. 16 ¶ 24.[6] Butler insisted at his deposition that the CPAP compliance form was not brought up during the examination. Pl.'s Cross-MSJ, Ex. S, at 101. But on Butler's medical examination form, completed the day of the exam, Ofili wrote that an "OSA [obstructive sleep apnea] letter [was] given" to him, Def.'s MSJ, Ex. 7, and Dr. Pervall attests that, at the exam, Butler was given "compliance report instructions to provide a 90[-]day CPAP compliance report," Def.'s MSJ, Ex. 16 ¶ 25. Butler's DOT Medical Card was placed on hold, then, for the additional reason that he had not submitted compliant CPAP reports. Def.'s MSJ, Ex. 16 ¶ 25.

---

[5] Although WMATA's sleep-apnea specialist testified that "[a]t all times relevant, WMATA's disqualification letters and medical evaluation forms incorrectly stated that" the relevant A1c floor was 8.5%, rather than 9.5%, Def.'s MSJ, Ex. 16 ¶ 14, the error is immaterial here, because Butler's only disqualifying A1c test result, at 10.9%, was too high by either measure.

[6] A flyer entitled "WMATA Medical Office Guidelines for Commercial Driver Fitness and Certification," which appears to have been created in April 2010, advises employees with sleep apnea to "bring a copy of your most recent compliance report and/or a statement from your sleep specialist" when "presenting for your DOT Physical." Def.'s MSJ, Ex. 1. It is unclear whether Butler received such a notice.

On August 13, 2014, WMATA's Medical Services and Compliance Branch sent a letter to Butler notifying him that he had been medically disqualified due to his diabetes and sleep apnea, and that to be reinstated, he needed to submit a compliant CPAP report, plus blood test results showing an acceptable A1c level. Def.'s MSJ, Ex. 11. The letter further explained that CPAP compliance required using the machine for "4 or more hours per night with a minimum of 70% usage." Id.

### 2. WMATA's Attempts to Reassign Butler

The August 13, 2014 notification letter also informed Butler that he had been "approved and referred to the Office of Human Resources services for Section 16L alternate job placement." Def.'s MSJ, Ex. 11. The 16L program is a job placement program for medically disqualified Local Union 922 WMATA employees. Def.'s MSJ, Ex. 18, at 13. Employees may apply for positions for which they consider themselves qualified, but 16L applicants are not given any special preference. Pl.'s Cross-MSJ, Ex. U, at 14. Moreover, absent an agreement between the bargaining units, Local 922 employees are not placed in positions designated for employees belonging to other WMATA bargaining units—including Local 689, the largest such unit. Id. at 15.[7]

On August 19, 2014, Ms. Roslyn Rikard—who manages the 16L program—sent a letter to Butler confirming that he had been referred to the 16L program for assistance in job reassignment. Def.'s MSJ, Ex. 17. Rikard also enclosed a list of internal job listings, and

---

[7] From 2015 on, employees in the 16L program have been automatically enrolled in WMATA's ADA reassignment program, which differs in significant ways from the former program. Pl.'s Cross-MSJ, Ex. U, at 20. For example, in the ADA program, managers are expected to actively look for appropriate openings in the organization, based on the relevant employee's background, skills, and experience. Id. at 20.

advised Butler that it was his responsibility to contact her monthly with medical updates. Id. Rikard was aware of Butler's medically disqualifying conditions. Pl.'s Cross-MSJ, Ex. S, at 104–05; Pl.'s Cross-MSJ, Ex. T, at 37. Butler recalls meeting with Rikard for monthly check-ins during his time in the program (apparently until June of the following year). Pl.'s Cross-MSJ, Ex. S, at 75. Ms. Rikard disputes Butler's recollection: She remembers meeting with him only a couple of times over the same period. Pl.'s Cross-MSJ, Ex. T, at 41. Throughout Butler's participation in the 16L program, Rikard would periodically send him job postings through email. Pl.'s Cross-MSJ, Ex. S, at 55, 76. Butler recalls being sent job applications for open positions, but he did not meet the qualifications for at least some of those spots. Pl.'s Cross-MSJ, Ex. S, at 106. In particular, Butler recalls submitting applications for the following positions: Special Police Officer, Mail Room Clerk, Traffic Controller, Custodian, Storeroom Clerk A, Customer Information Specialist, and Facilities Maintenance Clerk. Pl.'s Cross-MSJ, Ex. S, at 111–13.[8] Butler did not receive responses to these applications, and by his telling, Rikard merely told him to keep trying. Pl.'s Cross-MSJ, Ex. S, at 80. Ms. Rikard does not recall ever having a conversation with Butler about the jobs he was interested in or for which he had applied. Pl.'s Cross-MSJ, Ex. T, at 46.

According to Butler, he assumed he was not receiving responses to his job applications because members of Local Union 689 had preference over the majority of the positions for which he applied, and Butler was associated with Local Union 922. Pl.'s Cross-MSJ, Ex. S, at 134. When an employee wants to move into a position for which another union has preference, representatives from the two unions meet to determine whether to grant the request. Pl.'s Cross-

---

[8] Butler's Traffic Control and Custodian applications were submitted *after* his retirement. Pl.'s Cross-MSJ, Ex. S, at 80. The record does not indicate whether retired employees remain in the 16L program.

MSJ, Ex. T, at 81.  According to Rikard, this is a union policy, not a WMATA policy.  Id. at 81;

Def.'s MSJ, Ex. 18, at 82.  When an employee transfers from one bargaining unit to another, he

or she starts from the bottom of the seniority scale, notwithstanding his participation in the 16L

program.  Id. at 82.  Rikard noted that she would generally inform employees about the need to

speak with a union official when such situations arose.  Id. at 84.

### 3. Butler's CPAP Reports

In September 2014, Butler provided WMATA a medical report showing his A1c level to

be approximately 8.3, which by WMATA's standard, is considered "controlled."  Def.'s S.M.F.

¶ 36.  Butler nevertheless remained medically disqualified because he had not produced a

compliant CPAP report.  Def.'s MSJ, Ex. 16 ¶ 28.  Butler attributes the lack of a report to an

inability to pay his household electricity bill, which in turn prevented him from using his electric

CPAP machine.  Def.'s MSJ, Ex. 20, at 25, 51–52.  During this time Butler stayed at relatives'

homes but did not bring the CPAP machine with him; Butler claims he did not want to "press

[his] luck" by receiving free housing and using his relatives' electricity.  Def.'s MSJ, Ex. 20, at

53.

When Butler informed Rikard about his purported lack of access to electricity, and asked

her whether WMATA had battery-powered CPAP devices, she indicated that she was unaware of

that option and provided no follow-up on the matter.  Def.'s MSJ, Ex. 20, at 52; Pl.'s Cross-MSJ,

Ex. S, at 70, 78, 105.  WMATA's Medical Office generally does not supply CPAP machines,

which are typically covered by medical insurance.  Def.'s MSJ, Ex. 16 ¶ 33.  Butler never

requested a battery-operated device from his medical provider or through his insurance company.

Def.'s MSJ, Ex. 20, at 52, 71.

In January 2015, Butler resumed using his CPAP machine after receiving an advanced workers' compensation payment. Pl.'s Cross-MSJ, Ex. M; Ex. S at 114–16. Throughout the spring of 2015, Butler submitted numerous CPAP reports, but none of them met the relevant compliance standards, requiring that the machine be used for at least 4 hours per night, for 70% of the nights in the period.[9] For example, Butler's CPAP report for the period between August 29, 2014 and February 24, 2015 indicated that he used the machine for more than four hours only 1% of the time in that period. Def.'s MSJ, Ex. 12, at 1. A second compliance report, spanning February 10, 2015 to March 11, 2015, showed a usage rate of only 10%. Def.'s MSJ, Ex. 14, at 1. A third report, covering March 10, 2015 to April 8, 2015, showed that Butler used the device more than four hours per night only 20% of the time. Def.'s MSJ, Ex. 15, at 1. After the third failed submission, Butler contacted WMATA through his union representative, and was again told to submit a three-month reading. Pl.'s Cross-MSJ, Ex. S, at 116. After submitting multiple deficient CPAP compliance reports, and having received no income from WMATA except for sporadic workers' compensation pay since the time of his wrist injury in 2009, Butler decided to retire in June 2015. Pl.'s Cross-MSJ, Ex. S, at 85, 114–15.

### 4. The Complaint

In August 2015, Butler filed a six-count Complaint in this Court, alleging: (I) discrimination due to diabetes; (II) discrimination due to sleep apnea; (III) failure to accommodate by not placing him in a vacant position; (IV) failure to accommodate his request for an alternative CPAP machine; (V) constructive termination; and (VI) unlawful medical

---

[9] Butler claims that he did not understand these standards. Pl.'s Cross-MSJ, Ex. E ¶ 6. But they were communicated and emphasized to him repeatedly. For example, on February 25, 2015, WMATA Medical Services and Compliance Branch gave Butler a form requesting a two-week compliance report stating in bold: "Compliance standards: 4 or more hours per night with a minimum of 70% usage." Def.'s MSJ, Ex. 9; Ex. 11; Ex. 13.

testing.  See Compl.  The parties have engaged in discovery and cross-moved for summary judgment, and those motions are now ripe for consideration.

## II.  Legal Standard

Pursuant to Federal Rule of Civil Procedure 56, the Court shall grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" only when a reasonable finder of fact could find for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is "material" only if it is capable of affecting the outcome of the suit.  Id. Under this standard, the "mere existence of some alleged factual dispute" fails to defeat an otherwise supported motion for summary judgment.  Id. at 247–48.  In determining whether summary judgment should be granted, all evidence and justifiable inferences are drawn in favor of the non-moving party.  Id. at 253.  At this phase, it is not the role of the judge to assess the weight or credibility of the evidence, but rather to determine whether there is a genuine issue present for trial.  Id. at 249.

When the Court evaluates cross-motions for summary judgment, the general standards for summary judgment remain the same: "The court must 'construe all facts and inferences therefrom in favor of the party against whom the motion under consideration is made.'"  Mann v. Mahi, 2017 WL 1533473, at *4 (D.D.C. 2017) (quoting Calumet River Fleeting, Inc. v. Int'l Union of Operating Eng'rs., Local 150, AFL-CIO, 824 F.3d 645, 647–48 (7th Cir. 2016)).  The Court considers all materials in the record, including "depositions, documents, electronically stored information, affidavits [and] declarations."  Fed. R. Civ. P. 56(c)(1).

**III.    Analysis**

A.  Alleged Discrimination Due to Sleep Apnea

Butler contends that WMATA unlawfully prevented him from returning to his position as bus operator because of his severe obstructive sleep apnea.  Pl.'s Cross-MSJ at 16.  To recap, the Rehabilitation Act provides that "no otherwise qualified individual with a disability" may "be subjected to discrimination" by programs receiving federal funding "solely by reason of her or his disability." 29 U.S.C. § 794(a).  A qualified individual with a disability is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment that such individual holds or desires."  42 U.S.C. § 12111(8).  In order to establish a *prima facie* case of intentional discrimination under the Rehabilitation Act, a plaintiff must show: (1) that he is a disabled person within the meaning of the Act, (2) that he is able to perform the essential functions of the job with or without reasonable accommodation, and (3) that he has suffered an adverse employment action solely because of the disability.  Barth v. Gelb, 2 F.3d 1180, 1186 (D.C. Cir. 1993).

Once a plaintiff has established a *prima facie* case of discrimination, the burden shifts to the employer to articulate a legitimate and nondiscriminatory reason for the employment action.  Aka v. Washington Hospital Ctr., 156 F.3d 1284, 1288–89 (D.C. Cir. 1998) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)).  If the employer meets this burden, the plaintiff then has the burden to prove that the employer's explanation was merely a pretext to the discrimination.  Id.

The first and third elements of Butler's prima facie case are uncontested.  He had severe obstructive sleep apnea, which meets the Act's definition of disability.  And his disqualification as a bus operator was an adverse employment action.  The dispute here lies over the second

element: whether Butler was "otherwise qualified"—that is, was he capable of performing the essential functions of the bus operator position?

As discussed above, under the Rehabilitation Act, an individual is "otherwise qualified" if he can perform the essential functions of the job with or without reasonable accommodation. 42 U.S.C. § 12111(8).  If an employee is not so qualified, then the employer is not obligated to retain the employee.  See Carr v. Reno, 23 F.3d 525, 530 (D.C. Cir. 1994).  Essential job functions include the "fundamental job duties of the employment position."  29 C.F.R. § 1630.2(n)(1).  Evidence of a function being essential include, *inter alia*, the employer's judgment, written job descriptions, and time spent performing the function.  Id.

Courts are divided on the question of where the DOT Medical Card requirement fits into the disability discrimination framework.  Some courts have indicated that a driver's failure to meet the standards for a DOT Medical Card renders the driver unable to perform an essential function of his job, meaning that the driver fails to satisfy the "otherwise qualified" element of the *prima facie* case.  See Harris v. P.A.M. Transp., Inc., 339 F.3d 635, 638–39 (8th Cir. 2003); Bay v. Cassens Transp. Co., 212 F.3d 969, 974–76 (7th Cir. 2000).  Other jurisdictions have considered the DOT Medical Card certification to be a "qualification standard," which the employer may assert as a defense.  See Bates v. United Parcel Serv., 511 F.3d 974, 990 (9th Cir. 2007); Hatter v. WMATA, 2017 WL 1154949, at *4.

This Court need not resolve this conflict, however, because the application of either analysis yields the same outcome in this case.  Assuming, first, that obtaining a DOT Medical Card was an essential function of the bus operator position, Butler cannot show he was "otherwise qualified" for the job because at the time he sought to return to work, he did not have a DOT Medical Card that complied with FMCSA regulations.  See 49 C.F.R. § 391.11(a); 49

C.F.R. § 391.41 & 43.  Butler relies on his past tenure as a commercial bus driver for approximately fifteen years as evidence he is able to perform the job's essential functions, see Pl.'s Cross-MSJ at 7, but there is no suggestion that Butler lacked a DOT Medical Card during those years.  In other words, Butler's employment as a bus driver when he possessed a DOT Medical Card (and before he was diagnosed with sleep apnea, for that matter) does not prove that such medical certification is inessential to the job.  Butler also claims to have been "otherwise qualified" because he obtained a DOT Medical Card in February 2014 from his primary physician, Dr. Cumberbatch, but Cumberbatch was not a registered FMCSA medical examiner, see Def.'s MSJ, Ex. 21 at 1–3, a requirement for DOT Medical Card certifications since May 21, 2012.  49 C.F.R. § 391.42; 49 C.F.R. § 391.41(a).

Alternatively, assuming that Butler was "otherwise qualified," his inability to obtain a DOT Medical Card is still fatal to his claim under the Rehabilitation Act.  Recall that, where a plaintiff has established a *prima facie* case of discrimination (which the Court here assumes to be established), the employer must articulate a legitimate and nondiscriminatory reason for its adverse actions.  Aka, 156 F.3d at 1288–89.  Here, that legitimate reason is clear:  WMATA did not permit Butler to return to work because he lacked a DOT Medical Card.

The Rehabilitation Act provides that "[i]t may be a defense to a charge of discrimination under this chapter that an alleged application of qualification standards, tests, or selection criteria that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be job-related and consistent with business necessity."  42 U.S.C. § 12113.  The FMCSA regulations mandate that operators of commercial vehicles obtain medical certification before operating such vehicles.  40 C.F.R. § 301.41(a)(1)(i).  In other words, the DOT Medical Card was not only "job-related" and "consistent with business necessity," 42

U.S.C. § 12113, it was required by *law*.  And it is a defense to a claim of discrimination that the employer's action was "required or necessitated by another Federal law or regulation." 29 C.F.R. § 1630.15(e).

Here, WMATA's sleep-apnea testing process was consistent with regulations.  Recall that to be physically qualified as a commercial driver under FMCSA regulations, an individual must have "no established medical history or clinical diagnosis of a respiratory dysfunction likely to interfere with his/her ability to control and drive a commercial motor vehicle safely." 49 C.F.R. § 391.41(b)(5).  The FMCSA Medical Advisory Criteria further explain that "[e]ven the slightest impairment in respiratory function under emergency conditions . . . may be detrimental to safe driving," and the guidance lists "sleep apnea" as being among those "conditions that interfere with oxygen exchange and may result in incapacitation."  49 C.F.R. Pt. 391, App. A.  In light of that regulatory guidance, WMATA's approach to sleep apnea—viewing it not as an automatic disqualifier, but as a condition that an employee must demonstrate is under control by use of a CPAP machine, see Def.'s MSJ, Ex. 16 ¶ 34—strikes an eminently reasonable balance between the individual interests of employees with disabilities and the safety standards "required or necessitated by . . . regulation."  29 C.F.R. § 1630.15(e).  See also Hatter, 2017 WL 1154949, at *3 (reasoning that the plaintiff-applicant's failure to submit sleep-apnea results was a legitimate explanation for employer's decision not to hire).  It is undisputed that following Butler's return-to-duty medical exam on April 22, 2014, he never submitted a compliant CPAP report.  Butler was allowed 90 days to submit a compliant report before being considered medically disqualified on August 13, 2014.  Def.'s MSJ, Ex. 11.  He was then given several additional opportunities to submit compliant reports, but none of them provided sufficient data.  Def.'s MSJ, Ex. 12; Ex. 14; Ex. 15.

Finally, because WMATA has articulated a legitimate, nondiscriminatory reason, the burden then shifts back to Butler to show pretext, which he has not done. Indeed, the facts suggest that WMATA offered him multiple opportunities to comply with its medical requirements by permitting him to submit CPAP reports even after he had been deemed medically disqualified. See Def.'s MSJ, Ex. 12; Ex. 14; Ex. 15. For these reasons, even assuming that Butler was "otherwise qualified" for the bus operator position, WMATA's legitimate reason for preventing his return to duty—namely, that he was not medically certified in compliance with federal regulations—defeats his sleep-apnea discrimination claim.

B. <u>Alleged Discrimination Due to Diabetes & Allegedly Unlawful Testing</u>

Butler also argues that the medical disqualification based on his diabetes was unlawful, Pl.'s Cross-MSJ at 7, but Butler's argument fails for two reasons. First, because obtaining the required medical certification is an essential function for the bus operator position, Butler's sleep-apnea condition rendered him not "otherwise qualified," and therefore beyond the protection of the Rehabilitation Act on this basis alone. Second, even assuming that Butler was "otherwise qualified" despite his sleep-apnea condition, the third element of the *prima facie* case requires a plaintiff to show that the relevant adverse employment action would not have occurred *but for* the relevant disability. See <u>Gard v. U.S. Dep't of Educ.</u>, 752 F. Supp. 2d 30, 35–36 (D.D.C. 2010), <u>aff'd</u>, No. 11–5020, 2011 WL 2148585 (D.C. Cir. May 25, 2011). Here, however, Butler's failure to satisfy regulatory certification requirements—and more specifically, his failure to submit sufficient CPAP data—was alone sufficient for the decision to medically disqualify him, and his diabetes could not have been a but-for cause of WMATA's adverse employment action. Indeed, that is WMATA's very contention: It concedes that Butler's A1c blood glucose was at an acceptable, controlled level by September 2014. From that point on, the

only hurdle to his recertification and return to duty was his submission of adequate CPAP reports.

Butler brings a separate claim that the A1c test, which led to his diabetes-based disqualification, was an unlawful medical inquiry because it was not "job related and consistent with business necessity." Pl.'s Cross-MSJ at 14; see 42 U.S.C. § 12112(d)(4)(A); 29 C.F.R. §§ 1630.1(b), 1630.14(c). But this is not truly a distinct claim.[10] The A1c test is only relevant under the Rehabilitation Act framework to the extent that it provides (or fails to provide) a legitimate defense to Butler's diabetes discrimination claim. To the extent that Butler alleges that the test itself was unlawful, he has cited no supporting legal authority.

C. Alleged Failure to Accommodate by Job Reassignment

Butler next argues that WMATA failed to accommodate his disability by not placing him in a vacant position. See Pl.'s Cross-MSJ at 14. To prevail on a claim that WMATA failed to accommodate his diabetes and sleep apnea, Butler must prove: (1) he was a qualified individual with a disability, (2) WMATA had notice of the disability, and (3) WMATA unlawfully denied Butler's request for a reasonable accommodation. Ward v. McDonald, 762 F.3d 24, 31 (D.C. Cir. 2014) (citing Stewart v. St. Elizabeths Hosp., 589 F.3d 1305, 1307–08 (D.C. Cir. 2010)). Here, there is no question that Butler was an individual with a disability, or that WMATA was on notice of that disability. Rather, the parties primarily dispute two issues related to the final

---

[10] Butler contends his diabetes assessment was not sufficiently individualized because the medical staff did not ask how the diabetes was affecting his life work, how he was managing the disease, or about his medication use. Pl.'s Cross-MSJ, Ex. S at 98–99. However, the record indicates WMATA individually assessed Butler in accordance with FMCSA's Handbook Guidance. See Pl.'s Ex. A, at 174. Butler's health history and medication use were documented, followed by an examination recording Butler's height, weight, eyesight, hearing, pulse, and blood pressure. See Def.'s MSJ, Ex. 7.

element: whether Butler actually requested a reasonable accommodation and, if so, whether WMATA unlawfully denied the request.

In determining whether an employee has made an accommodation request, the employee need not invoke "magic words," but the "request must make clear that the employee 'wants assistance with his or her disability'" in order to resume working. Badwal v. Bd. of Trustees of Univ. of D.C., 139 F. Supp. 3d 295, 313 (D.D.C. 2015) (citing Loya v. Sebelius, 840 F. Supp 2d 245, 259 n.15 (D.D.C. 2012)). The employee bears the burden of requesting a reasonable accommodation. Badwal, 139 F. Supp. 3d at 313. Reasonable accommodations may include job restructuring, part-time schedules, and reassignment to vacant positions, among other arrangements. 42 U.S.C. § 12111(9).

Despite WMATA's protestations to the contrary, Butler has produced sufficient evidence that he made a request for reassignment as a reasonable accommodation. In particular, an email chain between WMATA employees provides evidence that Butler's attorney contacted WMATA about Butler's "[return-to-duty] options." Pl.'s Cross-MSJ, Ex. H, at 1–2; Ex. I. Butler also relies on his placement and participation in the 16L program as evidence of a request for a reasonable accommodation. Pl.'s Cross-MSJ at 20. The letter notifying Butler of his placement in the 16L program indicated that the program would provide him assistance with a job change, and Rikard and Butler both recall meeting to discuss his participation in the program. Def.'s MSJ, Ex. 17; Pl.'s Cross-MSJ, Ex. S, at 55; Pl.'s Cross-MSJ, Ex. T, at 41. While in the 16L program, Butler applied for multiple positions (albeit, apparently, jobs outside his collective bargaining unit or for which he was not qualified), which clearly would seem to put WMATA on notice that he was seeking some form of reassignment as an accommodation for his medical-based suspension from duty. Pl.'s Cross-MSJ, Ex. S, at 76–80; Pl.'s Cross-MSJ, Ex. U, at 26.

Together, the communications from Butler's attorney, Butler's active participation in the 16L program, and Butler's multiple requests for reassignment provide ample evidence that Butler was seeking reassignment as a reasonable accommodation for his disabilities.[11]

In response to Butler's claim that he requested a reasonable accommodation, WMATA presents a narrow argument that Butler never "requested reassignment to a *non-union represented* position at WMATA." Def.'s MSJ at 14 (emphasis added). Despite the apparent factual accuracy of WMATA's statement, case law does not require accommodation requests to align identically with the accommodation received. As a legal matter, it is sufficient that Butler requested reassignment to *some* vacant WMATA position for which he was qualified— notwithstanding that, once in the 16L program, he may have submitted applications for jobs outside his bargaining unit. See Aka, 156 F.3d 1284, 1303 (D.C. Cir. 1998) (identifying relevant request as one for "reassign[ment] to some existing vacancy for which he was qualified"). Taken together, Butler's lawyer's inquiry into his return-to-duty options coupled with Butler's enrollment in the 16L program eliminate any genuine dispute that Butler requested a reasonable accommodation in the form of a reassignment.

The second disputed issue relates to whether WMATA unlawfully denied Butler's request for a reasonable accommodation. Failure to provide reasonable accommodations is often determined by whether both parties engaged in an interactive process. "If a disabled employee shows that [his] disability was not reasonably accommodated, the employer will be liable only if

---

[11] Butler also attempts to rely on notes from his doctor requesting that he be allowed to work split shifts. Pl.'s Cross-MSJ at 20; Pl.'s Cross-MSJ, Ex. F. However, these notes were made in relation to Butler's carpal tunnel syndrome and therefore are not evidence of an accommodation request related to sleep apnea or diabetes. Pl.'s Cross-MSJ, Ex. F; see generally Thompson v. Rice, 305 F. App'x 665, 668 (D.C. Cir. 2008) (suggesting accommodation request for one disability is not a sufficient request for another unrelated disability).

it bears responsibility for the breakdown of the interactive process." <u>EEOC v. Sears, Roebuck & Co.</u>, 417 F.3d 789, 797 (7th Cir. 2005). The interactive process typically involves a "'flexible give and take' between the employer and employee 'so that together they can determine what accommodation would enable the employee to continue working.'" <u>Ward</u>, 762 F.3d at 32 (citing <u>Sears, Roebuck</u>, 417 F.3d at 805). To establish that a request was unlawfully denied, the plaintiff must show that the employer ended the interactive process or participated in bad faith. <u>Ward</u>, 762 F.3d at 32. When genuine issues of fact arise relating to the interactive process, it is often related to whether the employer was responsive to an employee's request for accommodation. <u>Ward</u>, 762 F.3d at 34.

As with other forms of reasonable accommodation, the reassignment process should be a two-way street. While the employee has an "obligation to demonstrate that there existed some vacant position to which he could have been reassigned," the employer has "a corresponding obligation to help [the employee] identify appropriate job vacancies (since plaintiffs can hardly be expected to hire detectives to look for vacancies)." <u>Aka</u>, 156 F.3d at 1304 n.27. As a general matter, the employer has failed in its obligation to attempt to reassign an employee where "an employee [must] on his own initiative appl[y] for a job on the same basis as everyone else." <u>Aka</u>, 156 F.3d at 1304. Rather, the disabled employee must be given more assistance than other job applicants, though employers need not go so far as to place a disabled employee in a position for which he is not qualified, or to create a vacant position when none are available. <u>Id.</u> at 1304–05.

Butler and WMATA offer conflicting accounts of their respective roles in the interactive process. Both agree that Butler participated in the 16L program, and that Rikard sent him job opportunities—many of which he was unqualified for—via email. Beyond this, the factual

accounts diverge.  Butler recalls monthly visits with Rikard to report on his medical progress and to discuss vacant positions of interest.  Pl.'s Cross-MSJ, Ex. S, at 75.  He also recollects applying for positions but never hearing back.  Id. at 80.  For her part, Rikard does not remember Butler visiting her monthly to provide status updates, nor does she recall Butler telling her about jobs of interest to him.  Pl.'s Cross-MSJ, Ex T, at 40–41.  It is true that WMATA employees in the 16L reassignment program were sent job applications periodically and had a point of contact in the person of Ms. Rikard.  Pl.'s Cross-MSJ, Ex. S, at 75–76.  But it is unclear from the record if the job vacancy notices Rikard was sending were in any way tailored to Butler's own qualifications, and there is no indication as to whether Butler was given any active assistance in identifying and applying for appropriate and available positions, as WMATA's ADA job assistance program apparently provides.  See Pl.'s Cross-MSJ, Ex. U, at 20.

In short, there remain genuine factual disputes as to: (1) whether there were any vacant positions at WMATA during the relevant period for which Butler was qualified; (2) whether, if such positions existed, WMATA identified any of those positions for Butler; (3) what assistance WMATA afforded Butler, over and above any other applicant; and (4) who was to blame for any breakdowns in the interactive process.  It may be that, during the period when Butler was seeking reassignment, there were no open positions which Butler was both qualified for and could practicably fill, due to bargaining unit seniority rules.  If that were the case, Butler's claim would likely fail, since "[r]eassignment can only be to an existing, vacant job for which the plaintiff is qualified, and positions to which other employees have a 'legitimate contractual or seniority right' are not considered 'vacant.'"  Alston v. WMATA, 571 F. Supp. 2d 77, 84 (D.D.C. 2008)

(citing <u>Smith v. Midland Brake, Inc.</u>, 180 F.3d 1154, 1170 (10th Cir. 1999)).[12] However, at this

stage, the parties have not resolved "whether appropriate vacancies existed [for Butler or]

whether [WMATA] adequately discharged its duty to help [him] find them." <u>Aka</u>, 156 F.3d at

1304 n.27. In light of these material, genuine disputes, the Court will deny both parties'

summary judgment motions as to Butler's reassignment claim.

    D.    <u>Alleged Failure to Accommodate Butler's Request for Alternative Testing</u>

    Butler next alleges that WMATA violated the Rehabilitation Act by failing to provide

him with a battery-powered CPAP machine during the period of time he purportedly lacked

access to electricity. As an initial matter, the ADA, whose standards are incorporated by the

Rehabilitation Act, is silent as to which party is responsible for the costs of medical examinations

and inquiries. <u>See</u> <u>generally</u> 42 U.S.C. § 12112(d). The Fourth Circuit, in affirming the

dismissal of an employment discrimination claim in part due to the plaintiff's failure to complete

a fitness-for-duty examination, took no issue with the plaintiff-employee having to bear the

burden of paying for the medical evaluation. <u>Porter v. U.S. Alumoweld Co.</u>, 125 F.3d 243, 245,

249 (4th Cir. 1997). The Sixth Circuit has cited that authority with approval. <u>Sullivan v. River

Valley School Dist.</u>, 197 F.3d 804, 812 (6th Cir. 1999).[13] If an employer has no obligation to

_____

[12] WMATA's position is that the collective bargaining agreements and their corresponding seniority structures made reassigning Butler to a position outside of the Local 922 unit an "undue hardship" under 42 U.S.C. § 12112(b)(5)(A). Def.'s MSJ at 15–16. But WMATA failed to include undue hardship as a defense in its Answer, and it has not sought leave to amend that Answer. In any event, under applicable case law, it appears that employers may be relieved of their burden to reassign employees to "positions to which other employees have a 'legitimate contractual or seniority right'" not because such a reassignment would be an undue burden, but rather because such positions are "considered 'vacant.'" <u>Alston</u>, 571 F. Supp. 2d at 84 (citing <u>Midland Brake</u>, 180 F.3d at 1170).

[13] Butler cites to EEOC Guidance materials in support of his position that the employer should bear the costs. Pl.'s Cross-MSJ at 26. The EEOC, whose authority here is only persuasive, has taken the position that an employer bears the burden of paying costs associated with employee visits to medical professionals of the *employer's* choice. <u>EEOC Enforcement

pay for return-to-duty exams, it follows that the employer likely has no duty to pay for ancillary costs associated with that exam, either.

In any event, it is WMATA's policy that employees purchase CPAP machines with their medical insurance rather than through WMATA. Def.'s MSJ, Ex. 16 ¶ 33.[14] Here, where WMATA actually paid for the initial medical-recertification exam, but required Butler to pay the additional cost of the at-home CPAP test (which doubles as a treatment device for sleep apnea), it was not unreasonable to require the employee to pay these additional costs. The Court therefore concludes that WMATA had no duty to pay for the CPAP device, and will grant summary judgment to WMATA on this count.

E.  Alleged Constructive Termination

Butler's final claim alleges that being placed on unpaid leave without accommodation forced his resignation, amounting to a constructive discharge. Pl.'s Cross-MSJ at 27. "A claim of constructive discharge based on disability discrimination 'must be predicated on a showing of either intentional discrimination, or retaliation.'" Ward, 762 F.3d at 35 (citing Mayers v. Laborers' Health & Safety Fund of N. Am., 478 F.3d 364, 370 (D.C. Cir. 2007) (quotation marks omitted)). To find for a claim of constructive discharge, the employer must have "deliberately made working conditions so intolerable" to lead the employee to resign. Ward, 762 F.3d at 35–36. An inability to make out a successful claim for failure to accommodate necessarily dooms a

---

Guidance on Disability-Related Inquiries and Medical Examinations of Employees under the Americans with Disabilities Act, Question 11 (July 21, 2000), https://www.eeoc.gov/policy/docs/guidance-inquiries.html (emphasis added). But the EEOC has not suggested, to the Court's knowledge, that the employer must pay for medical visits to professionals of the *employee's* choice, much less that an employer must pay for all costs associated with qualification standards. See id.

[14] The record is unclear where Butler acquired his original, electric CPAP machine.

constructive discharge claim.  <u>Ward</u>, 762 F.3d at 36 (citing <u>Cole v. Powell</u>, 605 F.Supp.2d 26 (D.D.C. 2009)).

Butler does not suggest that he experienced retaliation.  Rather, his constructive-termination argument focuses on whether WMATA intentionally discriminated against him. Pl.'s Cross-MSJ at 27.  In particular, Butler cites the fact that WMATA requested CPAP data in two-week intervals as evidence that working conditions became intolerable.  <u>Id.</u> at 29.  While there may be a dispute as to whether Butler needed to provide two weeks or three months of CPAP data, the undisputed facts show that for every CPAP report, Butler's compliance reports fell well below the 70% usage rate required.  Def.'s MSJ, Ex. 12; Ex. 14; Ex. 15.  And WMATA's requests for two-week CPAP reports were clearly attempts to be flexible in accommodating Butler's numerous noncompliant submissions.  No reasonable juror could view those actions as evidence of discriminatory intent.

## IV.    Conclusion

For the foregoing reasons, the Court will grant in part and deny in part WMATA's Motion for Summary Judgment, and deny Butler's Cross-Motion for Summary Judgment in its entirety.


CHRISTOPHER R. COOPER
United States District Judge


Date:    <u>July 31, 2017</u>